BOWLES, Price Administrator, v.
MUNSINGWEAR, Inc.

Civil Action No. 1147.

District Court, D. Minnesota,
Fourth Division.

Oct. 22, 1945.

934

Harry E. Witherell, of Chicago, Ill., and Hymen L. Greenberg, Office of Price Administration, of St. Paul, Minn., for plaintiff.

F. H. Stinchfield, John M. Palmer, and Stinchfield, Mackall, Crounse & Moore, all of Minneapolis, Minn., for defendant.

JOYCE, District Judge.

This is a suit by the Price Administrator against an underwear manufacturer for the sale of fall and winter underwear claiming violation of Revised Price Regulation No. 221, particularly sections 1389.-

302 and 1389.303. An injunction and treble damages are asked, but by agreement the question of damages is to be held in abeyance pending the determination of the injunction issue. There is little or no dispute as to the facts. The price at which defendant sold the underwear in question is conceded. Nor is there any question raised as to defendant's good faith. The only issue is whether defendant used the correct pricing formula in determining its ceiling prices.

■ To obtain the proper perspective I believe it advisable to consider the pertinent events in a somewhat chronological order. After the outbreak of World War II in December, 1941, it was obvious that our national economy would be subjected to severe strains and marked changes. The needs and demands of the military would have to take precedence and civilian economy would suffer. Material shortages, increased labor costs, and higher prices were predicted in all civilian consumer goods including the textile industry. The court can practically take judicial notice of this situation although the defendant offered proof thereof in the way of excerpts from trade and other contemporaneous publications.

The defendant is a large manufacturer of all types of underwear garments and enjoys a nation-wide trade. It is a "retailer" mill; that is, its customers sell directly to the consumer as distinguished from a "jobber" mill which sells to wholesalers. Starting in January, 1942, defendant began to receive orders for fall and winter underwear in larger quantities than in any comparable period. Retail stores were ordering many times the number of dozens of fall and winter underwear they had ordered in any previous January. The situation was such that defendant's own inventory was imperiled. These developments were matters of concern to defendant's management and it was decided that in view of this volume of business prices must be increased to reflect the then current costs. It is to be kept in mind that at the time there were no price regulations of any kind and that the war had commenced less than two months before. The Emergency Price Control Act became effective January 30, 1942, 50 U.S.C.A. Appendix, § 901 et seq. On February 2, 1942, defendant's new prices became effective. The method by which this change became effective becomes significant in view of the subsequent regulations issued pursuant to the Emergency Price Control Act. Defendant stopped filling new orders as of February 2nd and until February 6th was engaged in preparing the new prices on its entire line. These price changes were made effective as of February 2nd and so all accumulated orders and orders subsequent to February 6th were booked at the new prices. This policy was communicated to some customers by letter, to others by word of mouth. The complete new price list was sent to the printers on February 9th where it was printed and mailed to all of defendant's customers. This job was completed on February 19th but there was no way of ascertaining how many lists were printed and mailed on any given date.

On April 28, 1942, the general maximum price regulation became effective. This was the general "freeze" regulation which fixed ceiling prices on all commodities at the March 1, 1942, levels. This was the first regulation to affect the defendant and of course defendant's ceiling prices became the prices that were fixed in February as they were still in effect on March 1st. It was therefore unnecessary for defendant to make any price adjustment to conform to the regulation.

On September 15, 1942, Maximum Price Regulation No. 221 establishing ceiling prices for fall and winter underwear was issued to become effective September 21st. In brief, this regulation established four pricing rules or formulae. The first provided that the maximum price would be the highest price at which the manufacturer sold the garment by written order or contract after November 30, 1941, and before February 10, 1942. If the manufacturer could not price under this formula, he could use the price at which the garment was first offered for sale in a written or printed price list which was distributed generally to customers on or before February 10, 1942. If the manufacturer could not use either of these formulae he could add five per cent to his 1941 prices; and if none of these methods was available to him he could apply to the Administrator for an "in line" price. These last two methods are of little concern here as it is conceded that defendant made no attempt to apply them.

■ Under this original regulation it seems clear that defendant was not re-

quired to adjust its prices on any items on which it booked orders at the new prices on or before February 10, 1942, as such prices would be the ceilings as fixed by formula (1) of Section 1389.302(a) referred to above. There is no serious dispute on this question. However, on November 18, 1942, this part of Maximum Price Regulation No. 221 was amended to read:

"The manufacturer's maximum price shall be the highest price at which the manufacturer sold by written order or contract *for the fall and winter season of 1942,* the same garment of fall and winter knitted underwear after November 30, 1941 and before February 10, 1942;"

The italicized phrase constituted the amendment. It is the meaning of this regulation as amended that is the major issue in this case. The Office of Price Administration takes the position that the addition of the words "for the fall and winter season of 1942" disqualifies defendant from using its February, 1942 prices. In support of this contention it is argued that the statement of considerations accompanying the original MPR 221 shows an administrative intent to have jobber mills price under paragraphs 1 and 2 and retailer mills under paragraph 3; that the omission of the words "for the fall and winter season of 1942" was an oversight as testified to on the trial by an OPA attorney who helped draft the regulation; that the only factor to consider in determining whether a sale was for the fall and winter season is the manufacturer's intent, and it is claimed that defendant intended the February, 1942 prices to be for "fill-in" orders only and was not an "opening of the fall line." I do not consider any of these contentions to be sound.

Regardless of what was said in the statement of considerations which accompanied the original regulations, the regulation itself is so clear as to need no construction. Any manufacturer who sold any garment during the base period could fix his ceiling price thereby. There were no qualifications in the regulation about jobber or retailer mills or for what season the sale was made. The regulation itself defines the term "manufacturer" without reference to jobber or retailer mills. However, even the official press release which accompanied the issuance of the original MPR 221 uses such qualifying language

that no one could conclude from it that hard and fast rules were being laid down by which the jobber mills were to use one pricing formula and retailer mills another. This press release reads in part:

"*For the most part,* the first and second methods of determining maximum prices are *expected* to be used by so-called 'jobber' mills, who *customarily* offer fall seasonal underwear during December and January for delivery during the following July through December. These mills *usually* supply wholesalers or jobbers as well as bulk buyers, such as mail order houses and the chain store trade.

"The third method will *generally* apply to 'retailer' mills which sell directly to retail, department and specialty stores. These manufacturers *customarily* do not circulate price lists as early in the season as January." (Italics supplied.)

The implication from the original regulation, the statement of considerations which accompanied it and this press release, is that if a retailer manufacturer could qualify under either formula 1 or 2, he could price thereunder. The OPA attempts to connect the original statement of considerations with the subsequent amendment of November 18th through the testimony of an attorney who assisted in drafting both the original regulation and the amendment. In effect he testified that the words "for the fall and winter season of 1942" were omitted from Section 1389.302(a) (1) through an oversight and therefore the original statement of considerations should be read in connection with the regulation as amended.

I am disturbed by the thought that it is apparently seriously urged that the court should give weight to this testimony. That the public or the courts should be in any way bound by what was in the mind of a Government attorney when he drafted the regulation some three years before the trial, seems to be a dangerous doctrine. Particularly is this so when he testifies that the regulation was intended to say something that it specifically did not say, and when his explanation of the purpose of the amendment is at complete variance with the statement of considerations issued by the OPA at the time of the amendment. The statute requires that every regulation be accompanied by such a statement. 50 U.S.C.A.Appendix, § 902(a). Insofar as it pertains to the addition of

the words "for the fall and winter season of 1942" that statement reads:

"Under the Regulation ceiling prices for manufacturers are established at the prices at which written orders were booked during the period from December 10, 1941 to February 10, 1942. It appears that the only orders accepted by certain manufacturers for certain of the garments covered by the Regulation were 'fill-in' orders based on the level of costs and prices for the 1941 season. In order to correct this situation, sub-paragraphs (1) and (2) of Section 1389.302(a) are amended so as to make it clear that manufacturers are to establish their maximum prices on the basis only of written orders or contracts booked during the specified base period for the 1942 fall and winter season."

Nothing is here said of any oversight and the explanation is clear and logical. Some manufacturers had apparently made scattered sales during the base period of certain items for the 1941 season and the prices based on the 1941 costs. Without the amendment those sales would govern future ceilings which would be a hardship on these manufacturers. With the amendment they would not be bound by these prices and, I presume upon a showing that the sales were not for the 1942 season would be permitted to use one of the other pricing formulae. This condition did not affect defendant as it was pricing under its February prices which had been adjusted to reflect 1942 costs.

The only remaining question under formula (1) is whether these prices were on garments "for the fall and winter season of 1942." The Regulation does not contain a definition of this term nor does such definition seem necessary. The ordinary meaning of "garments for the fall and winter season of 1942" would, it seems to me, be garments that were to be used or worn in the fall and winter of that year. Whether a garment were in that category or not would seem to be a simple question of fact. That is the position taken by the OPA as late as July 24, 1944, when a Mr. Emerson, the Deputy Administrator for Enforcement in Washington, in writing to defendant's President said:

"We are, of course, interested in seeing and considering any evidence which indicates that orders taken by Munsingwear between February 2 and 10 were for the 1942 fall and winter season. It seems to me, however, that the showing you have made is not an indication of such a fact. Thus the increase in sales volume is entirely compatible with the increase in consumer demand during the 1941 season. Furthermore, even if it were established that retailers were doing advance buying in the early months of 1942, it would still hold true that fill-in orders for the 1941 season were also being received during that period. The first pricing method of MPR 221 would, then, not be available for those style numbers for which only fill-in orders were received in the base period. In addition, the prices being charged by the Company would be correct only as to those style numbers for which advance buying orders, as contrasted with fill-in orders, were received between February 2 and 10.

"Evidence which would have a bearing on the nature of the orders taken between February 2 and 10, 1942, would include a statistical comparison between the size and range of those orders and the size and range of orders taken in the springs and summers of 1941 and 1942 and in the opening calendar months of 1940 and 1941. Wherever possible a comparison should be made between the orders taken from the same customers in these different periods. If you care to submit any such evidence, we will be glad to review it and discuss it with you."

The tenor of this letter is that defendant's proof was not sufficient and suggesting what kind of proof to produce. Upon the trial OPA took an entirely different and inconsistent position. It was urged that only the manufacturer's intent should be considered and that evidence to show facts was immaterial. I cannot agree with this latter position of OPA and I construe the regulation to mean that the prices which govern a particular manufacturer are those at which he sold or booked orders for garments during the base period, which garments were for use or consumption in the fall and winter of 1942.

Defendant introduced a wealth of documentary evidence which stands practically uncontradicted in this record. The form of proof follows the suggestions set forth in Mr. Emerson's letter. Statistical comparisons are made between orders received by defendant for fall and winter underwear in the early months of 1942 and the similar period in 1941 and prior

years. This is broken down as to number of dozens and dollar value. Comparison is also made as to accounts of certain of defendant's customers selected by both parties. Comparison is made between defendant's 1942 first quarter increase in sales and the national increase in retail sales for the same period. This is broken down into specific weeks. Increase in department store inventories is compared with increase in sales, which is broken down as to kinds of consumer goods and by size of store. It would be impractical and is unnecessary to summarize all of these statistics. Suffice it to say that the weight of the evidence shows that during January, February and March of 1942 defendant received orders for fall and winter underwear in vastly greater quantities than in any prior year, that specified customers of defendant materially increased their orders for this type of merchandise over any prior comparable period, that defendant's increase in sales was greater than the national increase for the same period, that the inventories for retail stores increased all out of proportion to their sales increase in the same period. From these facts the conclusion seems obvious that prior to February 10, 1942, defendant was selling and booking orders for fall and winter underwear which was for sale to the ultimate consumer for the fall and winter season of 1942 and not for immediate sale or use in the 1941 season. Defendant was therefore justified in fixing its ceiling prices in accordance with paragraph 1 of Section 1389.302(a) of Revised Maximum Price Regulation 221 on the 127 items or styles for which it booked orders prior to February 10, 1942.

There were some sixteen items for which defendant booked no orders before February 10th and on these it seeks to justify its prices under formula 2 of Section 1389.302(a), which authorizes as the ceiling a price " * * * at which the same garment was first offered in the manufacturer's written or printed list for the fall and winter season of 1942, which was distributed generally to the customers or prospective customers of the manufacturer on or before February 10, 1942." As above explained, I consider defendant's February 2, 1942 prices, as contained in these price lists, to be in fact for the fall and winter season of 1942. The only question is the effect of the language "distributed generally * * * on or before February 10, 1942." These lists were effective February 2nd, the process of printing and distribution was commenced February 9th and concluded February 19th. This was probably not a literal compliance with the regulation. However, in construing the regulation with relation to these facts, all factors must be considered. This entire regulation (MPR 221) is aimed at fixing each manufacturer's ceiling prices in accordance with his own experiences and conduct during the base period. There is no connection or relation between manufacturers that affects prices. Thus two manufacturers making identical products may find themselves bound by different maximum prices. The whole purpose of the regulation is to judge the manufacturer's conduct during the base period. In this case the lists were in effect, were being used, and were partially distributed by February 10th. There can be no dispute but that the defendant was binding itself to these prices at that time and was doing so in the ordinary course of its business. If orders on these particular items had come in by February 10th they would obviously have been booked at the listed prices as were all other orders received. In such case, the prices would be justified under the first pricing formula. It is clear that these lists fulfill the intent and purpose of the regulation and I believe under all the facts were in substantial compliance therewith.

For the reasons expressed in this Memorandum I conclude the defendant was not in violation of Revised Maximum Price Regulation 221 and that plaintiff's case should be dismissed. Defendant will submit findings of fact and conclusions of law in accordance with the views herein expressed. Plaintiff is allowed an exception